UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TENNECO AUTOMOTIVE
OPERATING COMPANY INC.,

        Plaintiff,

vs.

Case No. 08-CV-10467
HON. GEORGE CARAM STEEH

KINGDOM AUTO PARTS and
PRIME CHOICE AUTO PARTS,

        Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (#27), OVERRULING DEFENDANTS' OBJECTIONS TO DECLARATIONS (#30, #32, #33, #35), AND GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT (#43)

Plaintiff Tenneco Automotive Company Inc. moves for a preliminary injunction and leave to file a Second Amended Complaint. Defendants Kingdom Auto Parts and Prime Choice Auto Parts (collectively "KAP") object to several declarations filed by Tenneco in support of its motion for a preliminary injunction. A hearing on the motion for a preliminary injunction was held on July 7, 2008. Tenneco filed supplemental briefs in support of their motion for a preliminary injunction on July 10 and 22, 2008. For the reasons set forth below, Tenneco's motion for a preliminary injunction will be DENIED. KAP's objections to the declarations filed by Tenneco in support of the motion for a preliminary injunction will be OVERRULED. Tenneco's motion for leave to file a Second Amended Complaint will be GRANTED.

### I. Background

Tenneco manufactures and distributes automotive shock absorbers and struts as a domestic corporation situated in Illinois. KAP sells automotive struts from its location in

Ottawa, Ontario. Tenneco filed a Complaint on January 31, 2008 alleging KAP is selling struts under the name "Quick-Strut" in violation of Tenneco's "Quick-Strut" mark. Tenneco alleged Lanham Act claims of trademark infringement, 15 U.S.C. § 1114, false designation of origin, 15 U.S.C. § 1125, and unfair competition, 15 U.S.C. § 1125. Tenneco also alleged copyright infringement, 17 U.S.C. § 501, based on KAP's alleged unauthorized copying of a Tenneco "Quick-Strut" instruction manual. Tenneco further alleged state law claims of unfair competition pursuant to the Michigan Consumer Protection Act (MCPA), M.C.L. §§ 445.901, et seq., misappropriation of business value, unjust enrichment, and tortious interference with prospective economic advantage. In response to three separate motions to dismiss filed by KAP on February 21, 2008, Tenneco filed a March 3, 2008 First Amended Complaint dropping its allegations regarding KAP's use of the "Quick-Strut" mark, and instead alleging KAP's unauthorized use of a unique product number stamped onto Tenneco's struts, and KAP's unauthorized copying of a "warning label," pledge[1], and "Quick-Strut" instruction manual. The First Amended Complaint alleges a Lanham Act claim of false designation of origin, 15 U.S.C. § 1125, based on KAP's unauthorized use of the stamped product number, a copyright infringement claim, 17 U.S.C. § 501, based on KAP's unauthorized use of the "Quick-Strut" instruction manual, a Lanham Act claim of false or misleading advertising, 15 U.S.C. § 1125, based on KAP's alleged unauthorized copying of the warning label and pledge, and state law claims of tortious interference with prospective economic advantage, violation of the MCPA, and unfair competition. KAP filed a fourth motion to dismiss on March 10, 2008 premised on lack of federal subject matter jurisdiction over the claims set forth in Tenneco's Complaint and First Amended Complaint. Following a May 14, 2008 hearing on the four motions to dismiss, the court issued a June

---

[1] "Our pledge to you is to provide a quality product that meets or exceeds OEM expectations."

17, 2008 Order granting in part KAP's March 10, 2008 motion to dismiss, dismissing Tenneco's copyright infringement claim without prejudice for lack of a registered copyright in Tenneco's "Quick-Strut Installation Instructions." The remainder of the four motions to dismiss were denied. In the interim, on May 12, 2008, Tenneco filed its motion for a preliminary injunction to enjoin KAP from using Tenneco's unique stamped product numbers, from selling KAP struts under the name "Quick-Strut," and from copying Tenneco's "Quick-Strut Installation Instructions." KAP filed notices of objections to seven declarations attached as exhibits to the motion for a preliminary injunction. On June 19, 2008, Tenneco filed its motion for leave to file a Second Amended Complaint to reallege its claims that KAP is liable for the unauthorized use of Tenneco's "Quick-Strut" mark, and to cure its since dismissed copyright infringement claim by alleging a February 28, 2008 copyright registration of the "Quick Strut Installation Instructions."

## II. Motion for Preliminary Injunction

Tenneco seeks a preliminary injunction enjoining KAP from using Tenneco's stamped product numbers on KAP's struts, from selling KAP struts under the name "Quick-Strut," and from copying Tenneco's "Quick-Strut Installation Instructions." Lanham Act and common law unfair competition claims for injunctive relief are generally governed by a "likelihood of confusion" standard as among consumers. Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 833 (6th Cir. 1983); Homeowners Group, Inc., 931 F.2d 1100, 1103, 1105 n.1 (6th Cir. 1991). Whether a likelihood of confusion exists among consumers depends on factors such as: (1) the strength of the mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. Carson, 698 F.2d at 833 (citing Frisch's Restaurants, Inc. v. Elby's Big Boy of Stuebenville, Inc., 670 F.2d 642, 648 (6th Cir.), cert

denied, 459 U.S. 916 (1982). A generic mark such as a part number may enjoy Lanham Act protection if it acquires "secondary meaning," that is, if the part number has become associated with the product's producer. Westward Co. v. GEM Products, Inc., 570 F.Supp. 943, 947 (E.D. Mich. 1983) (citing McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126 (2d. Cir. 1979), and Keebler Co. v. Rovira Biscuit Co., 624 F.2d 366 (1st Cir. 1980)). Copyright infringement requires proof of: (1) ownership of a valid copyright; and (2) copying of the constituent elements of the work that are original. Feist Publications, Inc. v. Rural Tel. Service Co., 499 U.S. 340, 361 (1991). Absent direct evidence, an inference of copying may arise by showing: (1) access to the allegedly-infringed work; and (2) a substantial similarity between the works at issue. Kohus v. Mariol, 328 F.3d 848, 854 (6th Cir. 2003).

### A. Record Evidence

KAP founder and President Gary Calagoure testified at the July 7, 2008 hearing that KAP adopted a new "Branding Policies & Procedures" in May 2008 that is now published on KAP's web page. Tr., at 65, 75. The policy reads:

> **Branding Policies & Procedures**
>
> Kingdom Auto Parts has successfully introduced products into the North American market under several brand designators, including "PRIME CHOICE" and "StrutTEK." Kingdom Auto Parts supports its brands with advertising, promotion and other forms of marketing, to develop their recognition and customer acceptance. Further to the objective of developing brand recognition and acceptance, please make it your policy in the field to practice the following style rules:
>
> • Always identify the Kingdom Auto Parts products principally by the brand designators assigned by Kingdom Auto Parts. For example, the "PRIME CHOICE StrutTEK" should not be referred to informally or mistakenly as a "Monroe Quick-Strut" or "Quick-Strut."
>
> • Relatedly, each application for a Kingdom Auto Parts product should be denoted *principally* by the part number assigned by Kingdom Auto Parts for that product.

4

> • However, it is acceptable to cross-reference the Kingdom Auto Parts product, by brand and/or part number, to an OEM or competitive aftermarket designator, to fairly inform of its intended application. For example, it is allowable to state: "PRIME CHOICE StrutTEK" Part No. CST1000012 replaces Monroe Part No. 171681.

Defendants' Exhibit 510. Calagoure admitted that the new marketing policy was instituted as a result of this January 31, 2008 lawsuit. Tr., at 76.

KAP's strut is packaged in a box prominently advertised as a "PRIME CHOICE StrutTEK." See Plaintiff's Exhibit 106. At one time, a label attached to the end of the "PRIME CHOICE StrutTEK" box displayed the Tenneco/Monroe part number followed by the KAP part number:

> 171994
> CST100003

Plaintiff's Exhibit 106. Calagoure testified that this type of cross-reference labeling was changed in December in 2007. Tr., at 67-68; Defendants' Exhibit 501, Calagoure May 28, 2008 Second Declaration, ¶ 8, at 2. The label now displays the KAP part number followed by the Tenneco/Monroe part number, and includes the modifier "replaces":

> CST100012
> **REPLACES**
> 171681

Defendants' Exhibit 501, attached as an exhibit to Calagoure May 28, 2008 Second Declaration.

Tenneco struts are stamped with a Tenneco/Monroe part number followed by a date. Plaintiff's Exhibit 136. KAP struts were also initially stamped with a Tenneco/Monroe part number and date, but were later modified as stamped with only a KAP part number. Defendants' Exhibit 501, attached Exhibit 1-G. Tenneco struts bear a roughly 2 inch by 4 inch colored label bearing the term "SENSATRAC," while KAP struts bear a label of approximately the same size bearing the name "StrutTEK." Plaintiff's Exhibit 103-105.

Calagoure admitted that he sent a Tenneco strut to China with instructions to copy the Tenneco strut. Tr., at 82. Calagoure testified it was "a mistake" to copy the stamped Tenneco/Monroe part number onto the KAP strut, a mistake he discovered in January or February 2008. Tr., at 82. Calagoure continued:

> Q. . . . . [Y]ou previously stamped Monroe's product numbers on your strut product, your strut assemblies, correct?
>
> A. [by Calagoure] Correct.
>
> Q. And you purportedly stopped doing that in March of this year [2008]?
>
> A. New inventory from March doesn't have it anymore.
>
> Q. After the commencement of this lawsuit [on January 31, 2008]?
>
> A. That's correct.
>
> Q. Okay. And did you bring with you today a copy of the unmarked strut assembly without the Tenneco numbers on it?
>
> A. No, I didn't.

Tr., at 76. Calagoure estimated that KAP had sold 10,000 to 20,000 KAP struts since November 2007. Tr., at 76-77. Prompted by the court's questioning, Calagoure testified that customer inventories of KAP struts could vary from as little as 10 to 500 struts, that customers with larger inventories "would be turning their inventory more often," and that, on average, "most wholesale distributors that we sell to, they turn their inventory at least once every 30 days," or "anywhere from 10 to 12 times a year." Tr., at 86-88.

Tenneco has proffered 27 declarations executed by various individuals who work in the automotive parts business. Plaintiff's Exhibit 111. Each of the declarations reads as follows:

> 2. I am familiar with [Tenneco] Monroe® brand of automotive struts and strut assemblies.
>
> 3. I am familiar with the five-digit product numbering system Monroe® uses for its SensaTrac® struts.

6

> 4. I am also familiar with the six-digit product numbering system Monroe® uses for its Quick-Strut™ strut assemblies.
>
> 5. When I see a strut product number that begins with the digits "71," I associate the product with Monroe® brand products.
>
> 6. When I see a strut assembly product number that begins with the digits "171," I associate the product number with Monroe® brand products.

Id. Jeff Tippie, Vice President of Detroit Auto Parts in Cleveland, Ohio, attests to a February 15, 2008 incident in which a customer cancelled an order for two Tenneco "Quick-Strut" part numbers 171672 after telling Tippie that he purchased the same struts for half the price from another supplier, Federated Auto Parts. Plaintiff's Exhibit 119. Tippie later learned that the struts were KAP struts. Id.

Terry Torbit, an account executive with independent parts distributor Hahn Automotive of Rochester, New York, testified that he maintains automotive part inventories for garages, fleets, and dealerships. Tr., at 19-20. Torbit testified that he was making a sales call on a customer a few months prior to the July 7, 2008 hearing, and observed a salesman from Auto Part International (API) walk in "with the Quick-Strut in [his] hand" and make a sales call. Tr., at 21, 27. The strut was unpackaged. Tr., at 26. Torbit testified he overheard the salesperson state that "this is our Quick-Strut, made in China, starts at [$99.95]. Here's the part number . . . ." Tr., at 21. The court overruled KAP's objection that the testimony constituted inadmissable hearsay. Tr., at 24. Torbit explained he himself identified the strut as a Tenneco "Quick-Strut" because the salesman had referred to the strut as such, and because the salesperson showed the customer the Tenneco part number on the strut which began with the prefix "171." Tr., at 26. Torbit testified he identified the term "Quick-Strut" with a Tenneco/Monroe strut assembly. Tr., at 26. Torbit initially believed that "Tenneco was undercutting us and selling a Quick-Strut to API for [] less money," then learned that "API is carrying the [KAP] struts . . . and selling them for a

7

lot less money than Monroe's."  Tr., at 27.

Tenneco Strategic Account Manager Patricia Fleck attests that, in a January 17, 2008 telephone conversation with the Manager of Eagle Service in Seneca, New York, she was told that two salesmen had made a sales call using an unpackaged strut, making the Manager believe that they were carrying an "economy" Monroe "Quick-Strut." Plaintiff's Exhibit 123.  The Eagle Service Manager assumed that one of the salesmen was a Tenneco/Monroe salesperson.  Id.  Fleck attests to her belief that the strut was a KAP strut in that one of the salesmen was from Keuka Packaging, a distributor of KAP struts.  Id.

Steven Siegel, Vice President of Sales at United Automotive Supply (UAP) in Warren, Michigan, attests that, in the Fall of 2007, KAP salesperson Jim Dolmetsch approached him and represented that KAP "was going to start selling what [Dolmetsch] said were 'Quick-Strut' assemblies." Plaintiff's May 12, 2008 Exhibit 17.  Siegel attests that Dolmetsch provided him with a price sheet, and that the "price listed for each Kingdom 'Quick-Strut' assembly ranged from $35-$50, whereas each Monroe® Quick-Strut® assembly typically costs $80-$100." Id.  Siegel continues that Dolmetsch provided him with a KAP strut and Tenneco strut for comparison purposes, that the struts appeared "identical," with the KAP strut "stamped with a '171' product number, which I associate with Monroe® brand products."  Id.  Siegel attests that he was instructed by Dolmetsch on January 15, 2008 to take KAP "assembly number '171616'" off UAP's shelves, at which time Siegel removed 14 KAP strut assemblies from inventory.  Id.  In response, Dolmetsch testified at the July 7, 2008 hearing that he did not holdout to Siegel that KAP's "StrutTEK" product was a Tenneco/Monroe product, nor did he refer to KAP's strut as a "Quick-Strut." Tr., at 90.

At the hearing, Hahn Automotive's Torbit also identified a manufacturer's price sheet.  Plaintiff's Exhibit 122.  The price sheet bears a KAP logo with the statement "Our parts are

priced to sell." Id. The price sheet is prominently titled "KINGDOM STRUTS," and bears an effective date of March 10, 2008. Id. The sheet lists Tenneco part numbers and prices:

| PART # | DESCRIPTION | LIST | JOBBER |
|--------|-------------|------|--------|
| 171281 | QUICK STRUT | 124.73 | 66.89 |
| 171352 | QUICK STRUT | 150.01 | 81.66 |

\* \* \*

Id. Torbit opined that the list was the manufacturer's price list that would be given to independent warehouse distributors. Tr., at 29. David Drake, a Tenneco District Manager, testified that he was making a sales call on distributor Auto-Wares Zone in the Chicago area on May 1, 2008 when he found a manufacturer's price list in a catalogue room. Tr., at 35-37. Drake testified that the price sheet had a "Quick-Strut" description underneath the "Kingdom brand name." Tr., at 37. Drake opined that Plaintiff's Exhibit 122 was not an Auto-Wares price sheet because it did not bear Auto-Wares' name, "which is precisely the reason I grabbed it." Tr., at 38. Drake continued that he had seen another similar KAP price sheet in the field "with an Auto-Wares logo on it, but it did not have any Quick-Strut information on it" except Tenneco's six-digit part number. Tr., at 39, 50. Drake testified the he last saw a price list "identical" to Plaintiff's Exhibit 122 during a mid-to-late May, 2008 sales visit. Tr., at 40. The court overruled KAP's objection to the admission of Plaintiff's Exhibit 122. Tr., at 42-44.

Auto-Wares Senior Vice President of Purchasing Scott Grill attests that the price sheet depicted in Plaintiff's Exhibit 122, as identified by Torbit and Drake, "was produced by our Pricing Department, without any involvement or knowledge of Kingdom Auto Parts or Prime Choice Auto Parts." Defendants' Exhibit 504. Grill further attests:

> At the request of Mr. Gary Calagoure, I have pulled this price list, and it will be replaced with a new price list making correct reference to "StrutTEK" and the appropriate part numbers for that brand of strut.

Id. KAP President Calagoure testified consistent with Grill's declaration that he acted

9

immediately after learning about the price sheet bearing KAP's name and former logo, instructing Auto-Wares to replace the list with a new price list making correct references to "StrutTEK" and appropriate part numbers. Tr., at 69-70. Calagoure testified that KAP was not the source of the price list set forth in Plaintiff's Exhibit 122. Tr., at 69-70.

Tenneco Director of Ride Control Channel Management Bill Denne attested by way of declaration that Tenneco authored its "Quick-Strut Installation Instructions" in 2003, and that Tenneco has distributed these instructions with packaged Tenneco "Quick-Strut" assemblies since May 2004. Plaintiff's May 12, 2008 Exhibit 1. Denne attests that KAP includes the "Quick-Strut Installation Instructions" within the packaging of KAP struts. Id. Tenneco's side-by-side comparison of Tenneco's "Quick-Strut Installation Instructions" and KAP's installation instructions reveals that, with the exception of the titles "QUICK-STRUT INSTALLATION INSTRUCTIONS" and "STRUT-TEK INSTALLATION INSTRUCTIONS," the instructions are virtually the same, including seven diagrams. Plaintiff's May 12, 2008 Exhibit 15. KAP President Calagoure attests that KAP revised its installation instructions in February 2008, providing a copy of the revised instructions. Defendants' Exhibit 501. Calagoure testified that KAP will not be including any installation instructions with its KAP struts in the future. Tr., at 102.

Licensed professional engineer Ph.D. Elborn Jones attests by way of declaration that, at Tenneco's request, he studied and tested the fatigue strength of four coil springs taken from KAP strut assemblies. Plaintiff's Exhibit 116. Ph.D. Jones applied a "Pontotoc Spring Test," which he described as repeatedly running the coil springs through cycles of compression, an accelerated fatigue life test the Pontotoc Spring Company applies to the coil springs it sells to Tenneco. Id. Ph.D. Jones attests that the lot of four springs failed the test because the average of 147,092.25 cycles-before-failure fell below a 150,000 cycles-before-failure requirement, and three of the four springs failed to satisfy a 75,000

to 150,000 cycles-before-failure requirement. Id. Ph.D. Jones attests that one of the springs was tested as having a Rockwell Hardness factor of 28-30, below the 48-52 Rockwell Hardness specification of the Pontotoc Spring Company. Id. Ph.D. Jones opines that the lower Rockwell Hardness of the KAP spring was "a major factor contributing to the failure of [the spring] to satisfy the Pontotoc Spring Test." Id. Bodycote Testing Group Laboratory Manager Michael Fec and Tenneco Support Engineer Kurt Adams attested to their involvement in testing. Plaintiff's Exhibits 117-118. Tenneco Product Manager Mark Christiaanse testified at the July 7, 2008 hearing that he had no opinion whether KAP strut assemblies were "inferior," and agreed that KAP's coil springs were not tested against any Original Equipment Manufacturer's (OEM) standards. Tr., at 57-58.

## B. Analysis

The court is to consider four factors in deciding whether to grant a preliminary injunction: (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant will otherwise suffer irreparable harm; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. Leary v. Daechner, 228 F.3d 729, 736 (6th Cir. 2000) (quoting McPherson v. Michigan High Sch. Athletic Ass'n., 119 F.3d 453, 459 (6th Cir. 1997) (en banc). The court is not required to make specific findings as to each of the factors if fewer factors are dispositive of the motion. Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003) (citing inter alia In re Delorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985)).

Even though Lanham Act trademark infringements may be presumed, without more, to cause irreparable harm, "there is no parallel presumption that because such infringements have occurred in the past, they will inevitably be continued in the future." American Bd. of Psychiatry and Neurology, Inc. v. Johnson-Powell, M.D., 129 F.3d 1, 4

(1st. Cir. 1997).

> The purpose of interlocutory injunctive relief is to preserve the status quo pending final relief and to prevent irreparable injury to the plaintiff-not simply to punish past misdeeds or set an example. See CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 620 (1st Cir. 1995); Acierno v. New Castle County, 40 F.3d 645, 647 (3d Cir. 1994). Absent likelihood of future infringement, there can be none of the ill effects that an injunction seeks to prevent: no loss of future profits, no loss of goodwill or reputation.

Id. at 4. See also Hecht v. Bowles, 321 U.S. 321, 339 (1944) (recognizing that "[t]he historic injunctive process was designed to deter, not to punish."). Even if presented with ample evidence of past infringing conduct, unfair competition, or bad faith, a district court may properly deny preliminary injunctive relief if the defendant proffers sufficient evidence and assurances that it will not commit future violations. American Bd. of Psychiatry, 129 F.3d at 6; Pan American World Airways, Inc. v. Flight 001, Inc., No. 06 Civ. 14442(CSH), 2007 WL 2040588, *6 (S.D.N.Y. July 13, 2007); Ferber Corp. v. Grodin, 92 U.S.P.Q. 93, No. 12196, 1952 WL 5700 (E.D.N.Y. Jan. 16, 1952).

Tenneco has failed to demonstrate that it will likely suffer irreparable harm if KAP is not ordered to cease stamping Tenneco product numbers onto KAP's struts, selling KAP struts under the name "Quick-Strut," or copying Tenneco's "Quick-Strut Installation Instructions." KAP has produced convincing evidence that it has stopped stamping Tenneco part numbers onto KAP struts beginning with KAP's March 2008 inventory. KAP instituted a new marketing policy in May 2008 — instructing KAP salespersons not to sell KAP "PRIME CHOICE StrutTEK" struts as a "Monroe Quick-Strut" or "Quick-Strut" — in response to the alleged sales incidents attested to by Tippie (February 15, 2008), Torbit (May 2008), Fleck (January 2008), and Siegel (Fall 2007). KAP's packaging, prominently advertising "PRIME CHOICE StrutTEK," now bears a part number label that clearly communicates that KAP's part number, beginning with the alpha-characters "CST," "replaces" Tenneco's part number. KAP's Calagoure instructed Auto-Wares' Grill to pull

12

the price sheet Grill created immediately after learning of the document. The document was last seen being circulated at Auto-Wares' Chicago warehouse in May 2008. KAP distributed new installation instructions in February 2008, and will no longer provide installation instructions with KAP struts in the future. The undisputed fact that KAP instituted these changes as a result of this lawsuit does not weigh in favor of granting Tenneco's motion for a preliminary injunction as punishment for KAP 's past "mistakes," as characterized by KAP President Calagoure. American Bd. of Psychiatry, 129 F.3d at 6; Hecht, 321 U.S. at 339.

Tenneco's argument that the court should order KAP to recall all of its struts stamped with the Tenneco part number and/or packaged with the original "STRUT-TEK INSTALLATION INSTRUCTIONS" is not persuasive. The evidence shows KAP had sold a maximum of 20,000 struts from November 2007 through July 7, 2008, a period of eight months. KAP stopped stamping Tenneco's part numbers onto KAP struts approximately three months before the July 2008 hearing.[2] KAP began using new installation instructions in February 2008, five months before the July 7, 2008 hearing, and will no longer include instructions with KAP struts. Considering the 10 to 12 month inventory turn around time, and that some of KAP's distributors maintain inventories of up to 500 units, it is likely that few, if any, KAP struts stamped with Tenneco product numbers and/or packaged with the original "STRUT-TEK INSTALLATION INSTRUCTIONS" remain in inventory.

Tenneco's argument that the court should grant injunctive relief even assuming KAP has stopped engaging in the alleged unfair competition and trademark infringement is also unpersuasive. A "preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which

---

[2] Calagoure clarified that some KAP April inventory did not have the Tenneco part number.

13

clearly demand it." Leary, 228 F.3d at 739 (internal citations and quotations omitted). Absent a showing of a likelihood of future irreparable harm which cannot be compensated by money damages, the circumstances here do not demand the injunctive relief sought by Tenneco. As did the Southern District Court in New York, this court rejects a "no harm, no foul" policy of granting injunctive relief where the defendant has demonstrated it will not commit future alleged violations, finding such a rule "at odds with the nature of a preliminary injunction, which is an extraordinary remedy . . . requiring the plaintiff demonstrate probability of irreparable harm in the absence of injunctive relief." Pan American, 2007 WL 2040588 at *6 (internal citations and quotations omitted). Consistent with the voluntary steps taken by KAP President Calagoure after this lawsuit was filed in January 2008, the court finds credible Calagoure's testimony that "we will change [our product] to not confuse the public in any way." Tr., at 75.

Tenneco has not demonstrated a strong likelihood of success on the merits of its unfair competition claims premised on KAP's use of Tenneco's stamped part numbers and alleged selling of KAP struts under the "Quick-Strut" mark, or its claim of copyright infringement. Even if Tenneco had met this burden, the balance of equities weighs against granting Tenneco preliminary injunctive relief in light of the evidence presented by KAP that it will not commit alleged future violations. American Bd. of Psychiatry, 129 F.3d at 6; Pan American, 2007 WL 2040588 at *6; Ferber Corp., 1952 WL 5700. Tenneco's unfair competition claim premised on use of its stamped part number is dependent on a finding that the stamped part number has acquired "secondary meaning" in the marketplace. Westward Co., 570 F.Supp. at 947. The existence of "secondary meaning" turns on such factors as: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) the amount and manner of advertising; (5) the amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional

copying. Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc., 270 F.3d 298, 311-312 (6th Cir. 2001). Tenneco's 27 proffered declarations are limited to individuals who work in the automotive parts business and do not, in the court's view, give a reliable indication of whether ultimate consumers identify a strut stamped with a five-digit number beginning with the digits "71," or a six-digit number beginning with the digits "171," as being a strut produced by Tenneco as opposed to a generic part number. In the context of its motion for a preliminary injunction, Tenneco's claim that KAP salespersons were passing off KAP struts as Tenneco's "Quick-Strut" product was dependent upon allegations that the salespersons were presenting unpackaged struts to Tenneco customers and obstructing the view of the approximately 2 inch by 4 inch "StrutTEK" label affixed to the strut. There is no indication from the record that KAP intended to market its struts for sale to ultimate consumers without using its "PRIME CHOICE StrutTEK" packaging or the "StrutTEK" label attached to the strut. Even the installation instructions formerly included within the packaging were advertised as "STRUT-TEK INSTALLATION INSTRUCTIONS." The court did not find the testimony and attestations of Tippie, Torbit, Fleck and Siegel to be particularly strong evidence of unfair competition. It should be emphasized that the claims underlying Tenneco's motion for a preliminary injunction do not involve patent or trade dress violations accusing KAP of unlawfully copying the entire strut assembly itself. While Tenneco has come forward with convincing evidence that KAP intentionally copied the entire strut assembly down to the Tenneco product number, this factor alone does not establish a strong likelihood that Tenneco will be able to prove "secondary meaning" with respect to its product number at trial. Herman Miller, 270 F.3d at 311-312. With respect to the copyright infringement claim, Calagoure testified that KAP began using new installation instructions in February 2008, before Tenneco acquired its February 28, 2008 copyright registration. Feist Publications, 499 U.S. at 361 (requiring proof of a registered

copyright).  At the time of the hearing, Tenneco's copyright infringement claim had been dismissed without prejudice for lack of a registered copyright.  See June 17, 2008 Order. Even to the extent Tenneco might likely prevail on its copyright infringement claim at trial, KAP's remedial measures taken with respect to the "Quick-Strut Installation Instructions" weigh against granting preliminary injunctive relief.  American Bd. of Psychiatry, 129 F.3d at 6; Pan American, 2007 WL 2040588 at *6; Ferber Corp., 1952 WL 5700.

The physical coil spring testing results as attested to by Ph.D. Jones, Fec, and Adams do not merit granting the requested injunctive relief.  The attestations do not significantly advance the claims underlying Tenneco's motion for a preliminary injunction of unfair competition and copyright infringement.  Consistent with the court's reasoning that Tenneco has not made a strong showing of a likelihood of consumer confusion, the limited testing of four coil springs against the standards of Tenneco's coil spring supplier, the Pontotoc Spring Company, does not warrant a conclusion that purchasers of KAP struts will attribute a coil spring failure to Tenneco and not KAP.  Without further statistical or scientific foundation, the court cannot conclude on this record that KAP struts are "inferior" to the OEM struts they are intended to replace.  See Tenneco Manager Christiaanse testimony, Tr., at 57-58.

Balancing the relevant dispositive factors, the court will deny Tenneco's motion for a preliminary injunction.  Leary, 228 F.3d at 736; Jones, 341 F.3d at 476.  To the extent not ruled on by the court at the July 7, 2008, KAP's evidentiary objections to the declarations of Drake, Jones, Fec, Christiaanse, Adams, Tippie, and Siegel will be denied as moot, the court having considered the evidence and assigned appropriate probative weight as fact-finder.

### III.  Motion for Leave To File Second Amended Complaint

Tenneco moves for leave to file a Second Amended Complaint to reallege its claims

that KAP is liable for the unauthorized use of Tenneco's "Quick-Strut" mark, and to allege copyright infringement consistent with the February 28, 2008 copyright registration of its "Quick Strut Installation Instructions." Leave to amend a complaint is to be freely granted when justice so requires. See Fed. R. Civ. P. 15(a). Absent bad faith or dilatory motive on the part of the movant, leave to amend should be granted unless the amended claim would not survive a motion to dismiss. Foman v. Davis, 371 U.S. 178, 182 (1962); Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1041-42 (6th Cir. 1991); Head v. Jellico Hous. Auht., 870 F.2d 1117, 1124 (6th Cir. 1989). In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1964-65 (2007). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (citing Bell Atlantic, 127 S. Ct. at 1965).

KAP opposes Tenneco's motion relying on matters outside the pleadings, such as evidence presented on Tenneco's motion for a preliminary injunction, and the deposition testimony of Tenneco Manager Christiaanse. Properly construing the factual allegations in the proposed Second Amended Complaint, the court is satisfied that Tenneco has alleged facts beyond the speculative level that could support the amended claims of unauthorized use of the "Quick Strut" mark and copyright infringement. Ass'n of Cleveland Fire Fighters, 502 F.3d at 548. The court's factual findings relative to Tenneco's motion for a preliminary injunction are not inconsistent with this ruling. The limited factual record developed for purposes of deciding Tenneco's motion for a preliminary injunction do not

preclude Tenneco from ultimately succeeding on the merits of its amended claims. The court declines to review Tenneco's proposed amended claims as on summary judgment under Federal Rule of Civil Procedure 56.

On finding that the amended claims would survive a motion to dismiss under Rule 12(b)(6), and in the absence of bad faith or dilatory motive, the court will grant Tenneco's motion for leave to file a Second Amended Complaint. <u>Foman</u>, 371 U.S. at 182; <u>Sinay</u>, 948 F.2d at 1041-42; <u>Head</u>, 870 F.2d at 1124.

## IV. Conclusion

Tenneco's motion for a preliminary injunction is hereby DENIED. KAP's objections to the declarations filed by Tenneco in support of their motion for a preliminary injunction are hereby OVERRULED. Tenneco's motion for leave to file a Second Amended Complaint is hereby GRANTED.

SO ORDERED.

Dated: September 25, 2008

s/George Caram Steeh  
GEORGE CARAM STEEH  
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 25, 2008, by electronic and/or ordinary mail.

s/Marcia Beauchemin  
Deputy Clerk

---